The Fourth District Appellate Court of the State of Illinois has reconvened. The Honorable Catherine E. Zienoff presiding. Good afternoon. Good afternoon, Your Honors. Good afternoon. This is 4-250086, People of the State of Illinois v. Larry D. McClain Jr. Would counsel for the appellant identify yourself for the record, please? Yes, my name is Emily DeStefano from the State Appellate Defender for Mr. McClain. Thank you. Would counsel for appellate identify yourself, please? Matthew Goldman on behalf of the People of Illinois. Thank you. All right. Ms. DeStefano, you may begin your argument. And Mr. Goldman, if you could mute yourself, please. Thank you. Okay. Good afternoon, Your Honors, and may it please the Court. I'm Emily DeStefano from the State Appellate Defender for Larry McClain. Mr. McClain was denied his right to a fair trial where multiple errors occurred in a case that hinged on the inherently suspect testimony of accomplice Joseph Hembrough as no forensic evidence linked Mr. McClain to the homicides. First, in this joint trial with one jury, the state played jail calls from non-testifying co-defendant, Kelton Galmore. The import of those calls was that Galmore wanted McClain to take accountability for his role in this crime. The calls were contextualized by the lead detective on the case. And then compounding this prejudicial error, the state relied on those calls as substantive proof of McClain's guilt. In those calls, Galmore said things like Junior needs to come take his charge and take his weight. And Galmore knew McClain was arrested on the date that he was arrested for this case. Junior, or Island Boy, that was Mr. Larry McClain. And taking weight or taking charge, that meant that he needed to take responsibility for his actions in this crime. And finally, the date of the call where Galmore said that they caught Island Boy, that was the date McClain was arrested for this case. This error was compounded when the state told the jury that the reason that Galmore knew who did it is because, quote, he did it and he did it with McClain, end quote. Though the jury was instructed that they were to use those calls only against Galmore, case law dictates that even when an instruction is given, the prejudice overcomes any potential cure. It's even more than that here, though, because the state substantively relied on it and it effectively nullified that instruction. This is a co-defendant statement directly implicating my client in a joint trial in front of the same jury where the lead detective confirmed exactly what Galmore meant in those calls. McClain was responsible for these murders. Few things can be seen as more prejudicial, and there's no conceivable trial strategy to not seek to sever these calls for these cases or, at a minimum, seek to redact the calls to remove all mention of Mr. McClain. It is incomprehensible that a competent trial attorney would allow such detrimental evidence to be admitted. The unjust nature of Mr. McClain's trial continued when the state's key witness, Joseph Hembrough, was improperly vouched for and his testimony improperly corroborated. Hembrough, a former co-defendant in this case, sought to save himself from the moment he knew he could be implicated. He later took a 20-year plea deal to testify against Mr. McClain and Mr. Galmore. The state unfairly bolstered his testimony in two instances. First, during trial, the state called jailhouse informant Michael Pullings to testify about a conversation Pullings had with Hembrough. According to the state, they did this because they believed counsels had accused Hembrough of recently fabricating or recently having a motive to lie to secure his plea deal. But in order for the state to have been permitted to admit Pullings' testimony, the conversation at issue needed to have happened before Hembrough's motive to lie or fabrication existed. Here, it did not. Hembrough's motive, from the moment he knew that he could be implicated in this crime, was to, in his own words, save his bacon. We know Hembrough's motive to save himself existed as early as October 22, 2021, when Hembrough first approached the police himself and said he wanted to give his version to save himself. And that came before his conversation with Pullings, which occurred on October 27, 2021. Pullings' statement, therefore, could not be admitted as a prior consistent statement. But even if it had been properly admitted, no limiting instruction was given. The state was only permitted to use Pullings' testimony to rehabilitate Hembrough. Instead, though, the state used Pullings' testimony substantively, telling the jury that they were allowed to use Pullings' testimony to, quote, conclude, yes, telling Michael Pullings what happened just as he told you, end quote. And this was accompanied by the state highlighting every facet of Pullings' testimony, using its substance to argue what Hembrough was testifying to is what actually happened. Then, in closing arguments, the state improperly vouched for Hembrough's credibility by telling the jury that if Hembrough did not testify truthfully, his plea deal would be revoked and he would face a life sentence. This relayed to the jury that the state believed his testimony. The state also told the jury that the truth wasn't even what the prosecutors wanted to hear, but was the truth, and the judge decided that, and that Hembrough was motivated to be truthful. The state first vouched for Hembrough's truthfulness and then essentially told the jury that if they didn't want to take the state's word for it, they didn't have to because it's the judge who gets to decide whether he's being truthful. But since Hembrough's plea deal had not been revoked, as the state had just said he was now a convicted murderer, the only reasonable conclusion for the jury was that the judge had already deemed Hembrough's testimony as truthful. Not only was this error, but the state telling the jury that the judge gets to make the decision, that usurped their duty as the triers of fact and the judges of credibility. Counsel was ineffective for failing to properly object and preserve each of the above issues, and the prejudice of those errors cannot be overstated in this close case. This case hinged on Hembrough's testimony, as he was the only eyewitness and no forensic evidence linked Mr. McClain to the homicides. A fingerprint of Mr. McClain's found on a glass jar is not disputed as it came from his attendance at a party earlier in the night. However, the DNA of Michael Smith was found on a brick at the crime scene that was used to break into one of the decedent's cars and ransack it. Also, two other men actually discovered the bodies of the decedents, but instead of reporting it, they planned to burglarize the residence. The police also never recovered a weapon from Mr. McClain, nor any weapon used in these homicides. Nearly all remaining parts of the state's case are challenged in Mr. McClain's brief. That includes the cell phone tower data that was improperly certified and therefore improperly Hembrough's self-serving testimony that was improperly bolstered by the state and pollings and Galmour's jail calls, as well as Michael Smith's improper other conduct testimony. Taking into consideration all of these evidentiary challenges raised in the briefs without those and without this direct vouch and corroboration of the state's key witness, the state's evidence was not overwhelming. This case was fraught with prejudice against Mr. McClain and warrants a new trial with new counsel. Thank you, Your Honors. And I'm happy to answer any questions that Your Honors may have. I have none. I don't see any at this time. You'll have an opportunity for rebuttal. Thank you. Mr. Goldman? Thank you, Your Honor. I'll focus on the points brought up by counsel, starting with the argument regarding the joint trial, in particular, Mr. Galmour's calls that were recorded in some end evidence. I would argue that the simplest reason why this court should affirm the trial court on this matter is that this was clearly a matter of affirmative acquiescence. Long before trial, it was known that what these calls were. Long before trial, they had agreed to a joint trial. Counsel, in fact, signed a document stating that these defendants should be tried together. And then ultimately, when it appears that they did want to move to sever, they specifically focused on a different co-defendant than Mr. Galmour. And so for this reason, counsel knew all of the circumstances, chose not to have any objection to the joint trial, in fact, agreed to the joint trial. And then ultimately, when the calls were being submitted into evidence, stated very clearly that they had no objection to these calls being entered into evidence. The precedent from the Illinois Supreme Court is very clear on this, that when you say no objection, that is affirmative acquiescence. For that reason, this court should conclude that allowing this evidence to come in could not have been any error attributed to the trial court. The only possible way that the defense can seek relief is through the doctrine of ineffective assistance of counsel. This also, though, should be a reason to affirm the trial court. This is a matter that courts have found time and again is a matter of trial strategy. A counsel could have looked at this situation and determined that their odds were better being tried together, where the state gets one bite at the apple, then risk being the second defendant being tried and have any of the possible evidentiary issues be cured in the second trial, thus essentially resulting in a bulletproof case for the state. Obviously, that did not work out for the defense in this case. But the fact that this is a legitimate trial strategy recognized by the courts means that this court should indulge in presumption that what counsel did was a matter of trial strategy and not a mistake. I would also argue that the confrontation clause should also be dispositive for the arguments related to these phone calls. These are obviously not testimonial statements. This is something that was made in a phone call to a third party. This is not something where Mr. Gilmore seemed to believe he'd be getting any benefit from having these calls recorded. It appears to be just the typical thing that happens, which is a person forgets that they're on a recorded line and they say things to an acquaintance or a friend or a family member that ends up being incriminating for them or for other people. This isn't a situation where their intent or their primary purpose would have been to deliver a statement to the government. If they wanted to do that, they could have simply knocked on their cell door and said, officer, I'd like to talk to somebody. There's no reason why a person would go in this roundabout way of attempting to basically give the equivalent of testimony over a recorded phone line. So for all these reasons, your honors, we would ask that you affirm the trial court on that issue. Next, the defense brings up this claim that the state was vouching for Mr. Hembrough's credibility. I think this is affirmatively rebutted by the record. What happened was the facts of the plea deal were made known to the jury, and the state simply recounted what those details were and argued that the witness would then be motivated to tell the truth because there's the possibility that if they are found to have lied, that the court could later on impose sanctions for that. The nothing about this was the personal opinion of the state. Nothing about this was the personal opinion of anybody in that courtroom. This was simply informing the jury, well, reminding them of what had come out of trial, which was that this witness subjectively believed that if they lied, they would be in trouble. That is something that the jury was completely fair in considering, and that certainly is not vouching in the form of any kind of personal opinion. The statement regarding Mr. Pullings, where essentially had this conversation prior to this plea deal, this is a situation in which the defense essentially wants to have it both ways. They clearly had it as a part of their strategy at trial to argue that the plea deal influenced the witness to tell lies, to be less than truthful. That was obviously what they're insinuating, and yet now here on appeal, they want this court to believe that this same motive to lie existed throughout the entire life of the case. If that were true, the plea deal would not be relevant. It would not change any fact of consequence in this case, but obviously that is not true. This is something that the jury could have put a lot of weight on. The jury could have decided this plea deal seems like such a good deal that it would have motivated somebody in a similar situation to be less than honest. That's why this prior statement was so important, and that's why it was clearly permissible under the rules of evidence. It is not required that the prior statement come before every possible motive to be dishonest. What matters is that the defense brought out this information, suggested that it motivated the person to be dishonest, and then this prior consistent statement came before that plea deal came about. So for that reason, this court should also affirm the trial court on this issue. I know counsel addressed briefly the cell tower issues. I'm certainly happy to answer any questions that your honors may have on that issue or any others, but if there are no further questions for the reindeer, I would simply stand upon the strength of my brief as written, ask this court to affirm the trial court. Thank you. Thank you very much. And Ms. DeStefano? Yes, your honors. Thank you. I want to touch first on the joint trial issue. Counsel made this argument in response brief on affirmative acquiescence. No objection, saying no objection does not automatically equal affirmative acquiescence. You have to invite the error. You have to know about the error. And counsel is saying that trial counsel knew well before about these calls and the content of these calls. And that's not accurate. The first time that these calls are seen in the record are, I believe, the sixth day of  So while trial counsel did originally make a motion to sever based on a different witness, it's not clear that he knew about these calls at that point. So at that point, when he found out about the calls, what he should have done was sought to renew that motion to sever and included it against Mr. Galmore. So if not, though, then they should have sought to redact those calls to scrub any mention of my client's name. But even so, if this were to be an affirmative acquiescence, we also argued ineffective assistance of counsel. And that's an important point here, because there is no trial strategy to let such detrimental evidence in against your client. And even if they were to have another trial or separate trials, I want to be focused on what happened in this trial. And in this trial, calls against my client that directly implicated him were admitted against my client. And these calls, these statements were testimonial, just because it was not in a coercive setting. This is a codefendant who was awaiting trial in jail, who knew his calls were being recorded and monitored. And a reasonable person in his shoes would have believed that these calls could be used against him as they are admissions from himself in these crimes. Then I want to move on to the vouching. While Mr. Hembrough did testify about the facts of his plea deal, that's not how the state phrased in closing arguments. They had just talked about how Hembrough was a convicted murderer. He's given up 20 years of his life, and he's motivated to be truthful now. And he not just what we want to hear, but what the judge decides. They didn't say that Hembrough testified to this. And so you can believe him. They didn't frame it that way. So I think it's important to read the closing arguments in the context with which they come. And then finally, for polling statements and testimony and admitting that it's not that defense that we want to have it both ways. In this case, there is not every possible motive. It's our argument that there was one motive and the motive that Hembrough had was to save himself. Just because a plea deal became possible for Hembrough doesn't change his motive. His motive was always to get that plea deal. It was to get the best case scenario for him. And he lied every step of the way. Defense counsel at trial commenting on Hembrough's credibility issues, commenting on the plea deal was in order to show that he had a credibility problem so that the jury could decide whether they would believe him or not. And so for those reasons, Your Honor, we again, we ask you to remand for a new trial. Thank you. Thank you very much. Thank you both for your arguments this afternoon. The court will take the matter under advisement and render a decision in due course. Court is adjourned for the day. Thank you very much.